DONNA J. FELLOWS

             **Plaintiff,**                **CIVIL ACTION NO. 06-CV-12084-DT**

    **vs.**                     **DISTRICT JUDGE ROBERT H. CLELAND**

**COMMISSIONER OF**             **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

             **Defendant.**

_____/

## REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

This Court recommends that Defendant's Motion for Summary Judgment be **GRANTED** (Docket # 11), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 8), and that Plaintiff's Complaint be **DISMISSED**.

### II.    PROCEDURAL HISTORY

This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

Plaintiff Donna J. Fellows filed an application for Disability Insurance Benefits (DIB) and Social Security Income ("SSI") Benefits in June 1994. (Tr. 38-42, 56-61). She alleged that she had been disabled since July 29, 1994, as amended. (*Id.*, 433). Plaintiff's claims were initially denied. (Tr. 43-55, 62-65, 71-74). Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 77-78). The ALJ denied Plaintiff's claims in an opinion issued on September 26, 1996. (Tr. 221-33). The Appeals Council granted review of the ALJ's decision and remanded the case to a new ALJ. (Tr. 234-41, 257-60). After a second hearing, the ALJ issued a new decision finding that Plaintiff was disabled as of

April 21, 1999. (Tr. 360-76). Plaintiff again sought review. (Tr. 377-83). The Appeals Council granted review and concluded that Plaintiff was disabled since April 30, 1995 but remanded the claim to determine whether Plaintiff was disabled prior to this date.[1] (Tr. 384-87). A third hearing took place before ALJ Larry Meuwissen on April 4, 2003. (Tr. 442-76). Plaintiff was represented by an attorney at this hearing. (Tr. 15-19, 444). ALJ Meuwissen subsequently determined that Plaintiff was not disabled prior to April 29, 1995 in a written opinion issued on October 28, 2003. (Tr. 20-31). The Appeals Council denied review and the ALJ's decision is now the final decision of the Commissioner. (Tr. 6-17). Plaintiff appealed the denial of her claims to this Court and both parties have filed motions for summary judgment.[2]

## III.  MEDICAL HISTORY

### A.  History Pre-Alleged Onset Date

Plaintiff, a licensed nurse practitioner, sustained an injury to her left shoulder while lifting a heavy patient at work in December 1981. (Tr. 215). She was initially off work for two months. *Id.* Plaintiff was seen by Dr. Leonard Jennings in May 1982. She complained of pain in the left trapezius area, the clavicle, the para-spinal area on the left side of her neck, the rhomboid area, and around the

---

[1]    The first ALJ determined that Plaintiff had the RFC to perform a range of light work. (Tr. 232). The Appeals Council determined that Plaintiff was limited to sedentary work and remanded for consideration of new evidence and the amended RFC. (Tr. 258-59). The second ALJ determined that Plaintiff had the RFC to perform sedentary work with a sit/stand option but was disabled as of April 1999 due to her mental impairment. (Tr. 370). The Appeals Council affirmed the ALJ's RFC finding but determined that Plaintiff was disabled as of April 30, 1995 because the Medical Vocational Guidelines directed a finding of disability based on Plaintiff's age as of that date and her ability to perform only sedentary work. The Appeals Council remanded for consideration of Plaintiff's disability prior to April 30, 1995 because new evidence was submitted and the hearing tape could not be located. (Tr. 384-85).

[2]    The relevant time period at issue on appeal is between July 29, 1994 (alleged onset date as amended) and April 29, 1995 (last day before being found disabled by the Appeals Council). Plaintiff was insured for DIB only through September 30, 1994. (Tr. 80).

scapula.  Plaintiff also reported some tingling and weakness in her hands and fingers.  She was not on any medication other than an occasional Darvon or Motrin but was being treated by a chiropractor. *Id.* An x-ray was unremarkable but Dr. Jennings noted that there was possibly a slight calcification in the area of the conoid and trapezoid ligament insertion.  *Id.*  Examination findings were essentially normal although Dr. Jennings reported that Plaintiff had moderate tenderness in her upper back and shoulder with some decrease in her shoulder's range of motion and the extension of her cervical spine.  (Tr. 214). Dr. Jennings recommended moist compresses and mild home exercises.  He also prescribed Naprosin and physical therapy with hot packs, an ultrasound, and range of motion exercises.  *Id.*

Plaintiff continued her treatment with Dr. Jennings on a bi-monthly basis through December 1982.  (Tr. 210-14).  Plaintiff's complaints remained essentially the same as did Dr. Jennings' treatment of them.  EMG testing was negative although Dr. Jennings reported that Plaintiff possibly had intermittent radiculopathy.[3]  X-rays were normal.   Plaintiff was neurologically intact and examination findings remained unchanged.  In July Dr. Jennings noted that Plaintiff was not doing many exercises and advised her to perform more specific exercises.  He also noted that he could not find anything seriously wrong with Plaintiff.  (Tr. 213).

Plaintiff was thereafter treated at the Capital City Industrial Clinic by Dr. A.M. Eckhouse in 1983.  She complained of continuing pain in her left shoulder area.  (Tr. 115).  Examination findings were normal and an x-ray was unremarkable.  Dr. Eckhouse reported that he could find no objective reason for Plaintiff's complaints.  *Id.*  In 1984 Plaintiff was treated by Dr. H.F. Labsan for complaints of left hand numbness and tightness and left forearm and shoulder pain.  She reported that she had some improvement with physical therapy and a TENS unit but her symptoms never disappeared.

---

[3]        Radiculopathy is a disease of the nerve roots, which if evident in the cervical spine, manifests as shoulder or neck pain. *Dorland's Illustrated Medical Dictionary* 1562 (30th ed. 2003).

Plaintiff took medication occasionally. (Tr. 116). An examination was essentially normal with a slight winging of the left scapula and slight weakness in her left deltoid and left hand grip. There was no evidence of atrophy and she had adequate motor power. *Id.* Dr. Labsan recommended a cervical myelography and a CT scan of Plaintiff's spine. *Id.* A subsequent thermogram was insignificant although a left C5 cervical dermatome of considerable age was noted. (Tr. 117).

Plaintiff was treated by Dr. Jennings on two more occasions in 1985. (Tr. 210). Plaintiff reported to Dr. Jennings that she mainly worked with her right hand because she continued to have pain in her left shoulder and neck and weakness and numbness in her left upper extremity. She stated that she dropped things and could not gauge temperatures with her left hand. *Id.* Plaintiff, who is left handed, had some weakness in her left hand upon examination but she was neurologically intact. Dr. Jennings recommended that Plaintiff have a myelogram but Plaintiff was reluctant to do so. Dr. Jennings subsequently ordered another thermogram, EMG test, and a nerve conduction study. *Id.* The record does not contain the results of any of these tests.

Plaintiff began treatment with Dr. William Redmon, an orthopedic surgeon, in September 1986. She was referred to him by her chiropractor, Dr. Kathryn Berryo. (Tr. 145-46). Plaintiff reported neck pain radiating along her scapula and into her left arm and numbness and tingling in her fingers, especially her thumb and second and third digits. (Tr. 145). Dr. Redmon reported that Plaintiff still refused to get a myelogram due to concerns of allergic reactions. Plaintiff had undergone various forms of physical therapy. She had also tried to wear a soft collar but it was uncomfortable. A TENS unit had provided relief but Plaintiff developed a sensitivity to the electrodes. *Id.* Plaintiff's only medication was Parfon Forte. Dr. Redmon noted that Plaintiff presented with "classical signs of depression" but that Plaintiff's demeanor "brightened up" during examination and with conversation. (Tr. 146). Upon examination, Plaintiff demonstrated a limited range of cervical spinal motion but a good range of

motion in her shoulder. No parathesias were evidenced. *Id.* X-rays were normal. Dr. Redmon concluded that Plaintiff likely had a ruptured cervical disc. Because Plaintiff would not undergo an myelography, Dr. Redmon recommended an MRI to confirm his diagnosis. (Tr. 146, 423).

Dr. Redmon resumed monthly treatment of Plaintiff in 1988. (Tr. 158-160). Dr. Redmon noted in February 1988 that an MRI showed some disc bulging but no evidence of an acute rupture. (Tr. 160). He recommended physical therapy and an eventual stretch mobility program. *Id.* In March Dr. Redmon noted that physical therapy had "not unexpectedly . . . stirred everything up." *Id.* He further noted that Plaintiff had a lot of anxiety so he prescribed Elavil, which helped. (Tr. 159-60). In July Dr. Redmon reported that Plaintiff was "reasonably stable" but she still complained of a fair amount of pain especially in her left arm and hand. Plaintiff had a good range of motion and almost negative compression. Dr. Redmon continued the same treatment plan. (Tr. 159). He noted in December that Plaintiff was fairly stable although Plaintiff reported that any exertion or attempted use of her arms and hands produced pain. (Tr. 158). Dr. Redmon stated that Plaintiff did not have a ruptured disc or show neurologic changes but he believed that Plaintiff had myofasciitis. He further noted that it was unlikely that Plaintiff could continue to function as a nurse's aide but that she should be directed toward retraining. Dr. Redmon's notes also indicate that Plaintiff did not "like to take pills" so the only medication she was taking was an occasional Parafon Forte. *Id.*

In February 1989 Dr. Michael Sperl, who had initially examined Plaintiff in December 1988, reported that he had examined a work tolerance screening program evaluation of Plaintiff conducted by a Midland Hospital's facility. The evaluator concluded that Plaintiff could perform sedentary work with: (1) an opportunity to sit/stand frequently as needed; (2) a limitation of 5 pounds 12 inches the waist and 66 inches the waist; (3) no pushing/pulling more than 27.5 pounds; and (4) no walking and carrying weight. The evaluator also noted that Plaintiff had a functional grip and prehension strength

and was able to work with small hand tools.[4]  (Tr. 134).  Dr. Sperl noted that the evaluation demonstrated significant limitations and recommended that Plaintiff be restricted to lifting no more than 25 pounds. (Tr. 118-38, 143).  A February 1989 x-ray showed mild cervical spondylosis.  The radiologist remarked that he did not have a "clear cut explanation for Plaintiff's described symptoms of pain in her neck and arm. (Tr. 139).

Dr. Redmon's notes from 1989 reflect further treatment of Plaintiff's complaints of neck, back, arm, and hand pain. (Tr. 155-58).  Dr. Redmon generally noted that Plaintiff was using very little to no medication and was dealing with her pain by using ice packs, rest, massage, and receiving occasional steroid injections into her elbow.  Her treatment plan remained essentially unchanged although she stopped physical therapy in late 1989. *Id.*  In February Dr. Redmon reported that Plaintiff had several "exquisite" trigger points in her left scapula and left elbow.  He also noted that Plaintiff complained of numbness in her fingers and difficulty holding onto objects.  However, Phelan's and Tinel's signs were negative and subsequent x-rays showed no bony abnormalities in Plaintiff's elbow. (Tr. 157-58).  Dr. Redmon also reported in March that Plaintiff had not been taking Elavil for some time so he wanted her to resume taking it. (Tr. 157).  Plaintiff was still not taking Elavil by April. *Id.*  Dr. Redmon noted in September that Plaintiff was fairly stable. (Tr. 155).

Dr. Sperl re-examined Plaintiff in December 1989.  Plaintiff complained of an increase in the intensity of her symptoms and that her neck and left shoulder pain were aggravated by activity.  Plaintiff also stated that it was difficult to sit for extended periods of time due to associated jelling.  Upon examination, Plaintiff had trigger point tenderness with palpation.[5] (Tr. 141).

---

[4]      Plaintiff reported to the evaluator that her maximum driving tolerance was 7 to 50 miles and that while driving she used her right hand to apply pressure to her left scapular region to relieve any discomfort. (Tr. 126-27).

[5]      Additional pages for this report are not included in the record.

In January 1990 Dr. Redmon reported that Plaintiff was doing fairly well (although she was not asymptomatic) and that ice massage provided "good control." He further noted that Plaintiff was not taking medication and that he did not believe anti-depressants were necessary at the time. (Tr. 155). In March Dr. Redmon indicated that Plaintiff had a very supple wrist and hand and had no problems "in that direction." Dr. Redmon later noted that Plaintiff was stable, meaning that she was not getting worse but she was not getting better. (Tr. 154). He stated that if Plaintiff limited her activity then she was able to function fairly well. *Id.* Plaintiff continued to use minimal medication. *Id.* In October 1990 Dr. Redmon reported that Plaintiff had "stirred things up" by helping her sister seal the windows of a trailer home but that Plaintiff felt better the next day. *Id.* He also stated that Plaintiff was functioning fairly well without Elavil. (Tr. 153).

Plaintiff continued treatment with Dr. Redmon in 1991. Dr. Redmon indicated in January that he placed Plaintiff back on anti-depressant medication and was having her resume physical therapy. He noted the next month that he was not sure if Plaintiff was taking her medication. (Tr. 153). Physical therapy was discontinued in March because Plaintiff was "moving better" and Dr. Redmon encouraged Plaintiff to increase her activities. Dr. Redmon also indicated that Plaintiff did not like to take medication although he was concerned about her depression. Nevertheless, he wanted to "see if we can ride it out and then perhaps gently get her back on her medications." *Id.* By April Dr. Redmon reported that Plaintiff had "gotten over the hump", looked quite a bit better, and moved better. He also stated that Plaintiff was quite active around the home and got along fine without medications. (Tr. 152). Plaintiff informed Dr. Redmon in June that she had been doing fairly well until she sneezed while driving to work, which cause her quite a bit of pain. She also indicated that she had some difficulty performing household chores and consequently got a little depressed. *Id.* In July Plaintiff displayed a good range of motion of her cervical spine with some irritability only at the extreme ranges. Her upper

extremities were neurologically normal. Dr. Redmon noted that Plaintiff's only medication consisted of an occasional Darvocet and that she did not need additional therapy. *Id.* Nevertheless, Plaintiff's complaints continued over the next few months so Dr. Redmon ordered another MRI of Plaintiff's cervical spine. (Tr. 151-52). An MRI taken in November 1991 showed congential C2-C3 intervertebral osseous fusion and mild ventral central extradural defects at C5-C6 and C6-C7 without apparent root encroachment. (Tr. 144).

Dr. Redmon's treatment notes from 1992 reflect that Plaintiff's complaints continued. (Tr. 149-51). Plaintiff still did not want to take medication for her pain but she occasionally took non-prescription Tylenol. Dr. Redmon told Plaintiff that he could place her on effective medication that was not addictive and had minimal side effects but that the decision to take medication was Plaintiff's to make. Dr. Redmon also placed Plaintiff on Pamelor in February for her depression but Plaintiff stated that it made her "spaced out" so she stopped taking it. No other anti-depressant medication was prescribed. Dr. Redmon generally described Plaintiff as doing fairly well with a stabilized condition noting that "things got stirred up" on several occasions when Plaintiff was extremely active performing household chores. Dr. Redmon further stated that he did not expect any changes to Plaintiff's condition. *Id.* Dr. Redmon saw Plaintiff on 5 occasions in 1993 and his comments regarding her condition and treatment remained the same. (Tr. 147-48). There is no indication in the 1993 records regarding depression. *Id.*

In June 1994 Dr. Berryo stated in a letter that her diagnosis of Plaintiff as of June 20, 1989 (which was Plaintiff's last examination date) was chronic cervical and thoracic subluxation with myalgia nerve root irritation and peripheral neuritis with left arm and hand sensory deficit. (Tr. 140). She also noted that she had treated Plaintiff on a frequent basis between December 1981 through April 1988 and

that Plaintiff had been compliant in her treatment. Plaintiff had responded to treatment but only on a temporary basis. *Id.*

**B.** **History Post-Alleged Onset Date**

On July 29, 1994 Dr. Abraham Oommen performed a consultative examination of Plaintiff. (Tr. 161-66). Plaintiff reported neck pain which radiated into her left shoulder and arm and bilateral hand pain, spasms, numbness, and tingling, which was worse at night and caused difficulty with sleeping. Plaintiff also stated that she had difficulty opening jars, buttoning clothing, tying shoelaces, and writing. (Tr. 161). Plaintiff took Darvoct once every two weeks and regular Tylenol 2 to 3 times per day. (Tr. 162).

Dr. Oommen observed that Plaintiff had no difficulty getting on or off of the examination table and had a normal gait and stance. (Tr. 163). An examination of Plaintiff's extremities showed no muscular atrophy. Dr. Oommen noted no muscle spasm of Plaintiff's para-spinal muscles although tenderness was present over the entire cervical spine. *Id.* There was also a limited range of flexion, extension, and rotation of Plaintiff's cervical spine and a slightly decreased range of dorsolumbar spinal motion. Straight leg raising tests produced complaints of pain. *Id.* An examination of Plaintiff's hands showed that she had a 50% decrease in grip strength on the left with finger squeezing but strength on the right was within normal limits. No swelling or deformity was noted. She had a full range of motion in her hands and could oppose her thumb to all fingers. There was also no muscle atrophy. However, Plaintiff demonstrated difficulty opening a jar and picking up coins with her left hand. Plaintiff also had decreased touch and pin prick sensations at the fourth and fifth digit of her right hand and at the first and third digit of the left hand. (Tr. 163-64).

In September 1994 a state agency medical consultant reviewed Dr. Oommen's report and completed a Physical Residual Functional Capacity ("RFC") form. (Tr. 45-52). The consultant

concluded that Plaintiff had the RFC to: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2) stand/walk/sit for about 6 hours in an 8-hour workday; (3) occasionally use left-handed controls; (4) occasionally climb, balance, kneel, crouch, and crawl; (5) frequently stoop; and (6) occasionally use her left extremity for handling and fingering. (Tr. 46-48). In November 1994 Dr. Herschel J. Wells affirmed the consultant's findings. (Tr. 52).

In February 1996 Dr. Sharping, a chiropractor, reported that he had been treating Plaintiff from May 1993 to January 1996 for headaches, pain and numbness in her arms, scapular pain, muscle spasms, lower back pain, numbness in her left, big toe, chest pain with exertion, and left knee pain. (Tr. 174). Dr. Sharping noted that chiropractic care had provided only temporary relief. *Id.*

## IV.  **HEARING TESTIMONY**

### A.  **Plaintiff's Testimony**

Plaintiff was 57 years old when she testified in April 2003. (Tr. 446). Plaintiff testified that during the relevant time period she had pain and numbness in her hands and she could not hold onto items such as pens and wash clothes or pull apart items. She also had severe back pain and foot problems and she could hardly walk. (Tr. 453-54). Plaintiff told the ALJ that her back problems began in 1981 when she injured it at her job as a nurse trying to catch a patient. (Tr. 455). Plaintiff continued to have problems with her back, neck, shoulders, arms, and hands even after she quit working as a nurse. (Tr. 455-56). She stated that she had trouble sitting. When she was in a car, she put a pillow behind her back or drove with her arm behind her and the seat set perfectly straight. She also could not lean back on her left side. (Tr. 456). Plaintiff testified that she would wake up during the night because of numbness in her hands and that she did not feel well-rested in the morning. (Tr. 459). Plaintiff further testified that she had problems with her eyes, which made it difficult to read fine print. (Tr. 457). She stated that she had to stop wearing contact lenses at

some point but she could not remember the date. (Tr. 461). Plaintiff also stated that she had tried one medication prescribed by Dr. Redmon but it "space[d] [her] out" so she stopped taking it. (Tr. 464).

B.     **The VE's Testimony**

Ms. Michelle Ross testified as a vocational expert at the April 2003 hearing. (Tr. 203-04, 465-76). The ALJ asked Ms. Ross to identify the type and number of jobs that would have been available between 1988 and 1994 in the regional economy for an individual of Plaintiff's age, education, and prior work experience who had the RFC to perform work that: (1) allowed for a sit/stand at-will option; and (2) involved lifting no more than 10 pounds occasionally. (Tr. 467-68). Ms. Ross testified that such an individual could perform work as a security monitor (4,100 jobs), ticket seller (2,500 jobs), information clerk (3,200 jobs), and telemarketer (3,800 jobs). (Tr. 469). Ms. Ross also testified that these jobs were simple and unskilled and would not be precluded if the hypothetical individual were moderately limited in her ability to maintain concentration, persistence, and pace, exercise independent judgment, or set realistic goals. *Id.*

In response to questioning by Plaintiff's counsel, Ms. Ross testified that the jobs that she identified would not be precluded for an individual who was limited to lifting no more than 5 pounds 12 inches below the waist and 66 inches above the waist. (Tr. 471). Similarly, the jobs would not be precluded for an individual who could not walk while carrying weight. (Tr. 472). Ms. Ross further testified that an acceptable norm for absenteeism in a competitive work environment for these jobs was 1 to 2 times per month depending upon how repetitive the absences became. *Id.*

## V.    LAW AND ANALYSIS

### A.    STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

### B.    FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff had to show that:

(1)    he was not presently engaged in substantial gainful employment; and

(2)    he suffered from a severe impairment; and

(3)    the impairment met or was medically equal to a "listed impairment;" or

(4)     he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work.  If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'"  *Id.* (citations omitted).

## C.     ARGUMENTS

The ALJ determined that Plaintiff had the following "severe" impairment: degenerative disc disease of the cervical spine with radiculopathy into the left upper extremity.  (Tr. 30).  He further concluded that despite this impairment Plaintiff had the RFC to perform sedentary work that provided for a sit/stand at-will option.[6]  *Id.*

Plaintiff alleges that the ALJ erred at step two in finding that her documented depression did not amount to a severe impairment.  She further contends that the ALJ's RFC finding is not supported

---

[6]     "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. §§ 404.1567, 416.967(a).

by substantial evidence because he did not include any limitations related to her "severe" impairment of left, upper extremity radiculopathy.

### 1. Plaintiff's Depression

The ALJ determined that the evidence failed to establish the existence of any significant severe mental impairment during the relevant time period. (Tr. 27). Plaintiff alleges that the ALJ erred in making this determination. She points to Dr. Redmon's records in which he stated that Plaintiff had depression for which he prescribed medication and to a 1999 report completed by Dr. Capputo, a psychologist and consultative examiner, who diagnosed Plaintiff with major depression. (Tr. 334-40).

The step-two burden of establishing a "severe" impairment has been characterized as *"de minimis." See Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Murphy v. Sec'y of Health & Human Servs.*, 801 F.2d 182, 185 (6th Cir. 1986). Under the regulations, an impairment is "not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities, [such as] . . . [u]nderstanding, carrying out, and remembering simple instructions, [and][u]se of judgment."[7] 20 C.F.R. § 404.1521. Furthermore, an impairment qualifies as "non-severe" only if it "would not affect the claimant's ability to work," regardless of the claimant's age, education, or prior work experience. *Salmi v. Sec'y of Health & Human Srvs.*, 774 F.2d 685, 691-92 (6th Cir. 1985). Only slight abnormalities that minimally affect a claimant's ability to work can be considered non-severe. *Higgs*, 880 F.2d at 862; *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985). Therefore, the application of the requirement to establish "severity" is quite "lenient," and generally it is "employed as an administrative

---

[7]   According to 20 C.F.R. § 404.1520a(c)(3), the Commissioner (when evaluating the severity of a mental impairment) must evaluate a claimant's deficits in activities of daily living, social functioning, and concentration, persistence, or pace and rate those on a five-point scale ranging from none, mild, moderate, marked, and extreme. The regulations state that if "we rate the degree of your limitations in these areas as "none" or "mild", we will generally conclude that your impairment(s) are not severe. . . ." 20 C.F.R. § 404.1520a(d)(1).

convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Higgs,* 880 F.2d at 862-63.

Despite this *de minimis* standard, the ALJ correctly determined that the evidence did not establish a "severe" mental impairment during the relevant time period. Plaintiff points to no evidence indicating that she had a mental impairment between July 29, 1994 and April 29, 1995. Indeed, Plaintiff did not even allege that depression or any other mental impairment was the cause of her disability in her 1994 SSI and DIB applications and she did not report any work-related limitations that were caused by her depression. (Tr. 87-101, 108-11).

Plaintiff also does not point to any evidence that the ALJ overlooked as he considered the evidence of depression proffered by Plaintiff which preceded and followed the relevant time period. The ALJ noted that there were sporadic statements in Dr. Redmon's treatment notes between 1986 and early 1992 indicating that he believed Plaintiff was depressed. (Tr. 27). However, the mere fact that Plaintiff was "diagnosed" with depression does not equate with a finding that Plaintiff's depression was "severe" or disabling.[8] *See Foster v. Brown*, 853 F.2d 483, 489 (6th Cir. 1988). There is nothing within Dr. Redmon's reports indicating that Plaintiff's depression affected her mental ability to perform basic work activities during the relevant time period and Plaintiff does not point to any evidence demonstrating such an effect.[9] Furthermore, Plaintiff provides no legal support for her argument that

---

[8]     Even assuming that Dr. Redmon, an orthopedic surgeon, was medically qualified to diagnose Plaintiff with depression, there is no indication in his records as to the medical basis for a diagnosis of major depression. Disability based upon mental impairments must be established by "medical evidence consisting of symptoms, signs, and laboratory findings . . .." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(B). Furthermore, the medical evidence must come from an acceptable medical source. *Id.*, at (D)(1)(A). The medical evidence necessary to prove an affective disorder, which includes major depression, are set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.

[9]     Plaintiff's original alleged onset date was in 1988, which was when she being treated by Dr. Redmon. Nevertheless, as indicated above, Plaintiff did not assert that depression was a basis for her disability.

the prescription of anti-depressant medication establishes that an individual's mental impairment is "severe." Nevertheless, the record indicates that Plaintiff was only sporadically prescribed anti-depressants between 1986 and February 1992 and that Plaintiff was often not compliant in taking the medication when it was prescribed. (Tr. 145-60).

The ALJ also noted that Dr. Capputo had completed a report diagnosing Plaintiff with major depression. However, he determined that this report, which was prepared in 1999, was not relevant to establishing the existence of a severe mental impairment between July 1994 and April 1995. (Tr. 27). Plaintiff argues that Dr. Capputo's diagnosis of major depression relates back to the relevant time period and merely confirms Dr. Redmon's previous diagnosis. However, there is nothing within Dr. Capputo's report, based upon one examination, that suggests he believed Plaintiff had major depression during the relevant time period. Rather, Dr. Capputo's report suggests that he assessed Plaintiff's current condition as evidenced by his assignment of only a current Global Assessment of Functioning ("GAF") score. Moreover, as noted previously, Plaintiff points to no contemporaneous evidence to show that Plaintiff suffered from any mental limitations in her ability to perform basic work activities despite any depression.[10]

---

[10]     Plaintiff has not articulated how her depression affected her mental RFC such that the ALJ's RFC finding was somehow fatally flawed. She only argues that the ALJ's RFC finding was flawed because it did not include her diagnosis of "major depression". However, the Sixth Circuit has found that the ALJ need not include a diagnosis of a mental impairment directly into his RFC finding or subsequent hypothetical question. *Webb* v. *Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). Nevertheless, the Court notes that Dr. Capputo found Plaintiff moderately limited in her ability to: (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (2) set realistic goals or make plans independently of others. (Tr. 331-32). It was based upon this assessment that an ALJ found Plaintiff disabled as of March 1999 after the second hearing. However, the VE in the recent hearing testified that such moderate limitations would not preclude Plaintiff from performing the jobs during the relevant time period which she had identified.

The ALJ further noted that there was no evidence that Plaintiff had ever sought or received treatment from a mental health practitioner prior to April 30, 1995. (Tr. 27). Plaintiff argues that it is a "questionable practice" for an ALJ to "chastise" mentally ill individuals for their failure to receive treatment, citing to *Blakenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989). The Court in *Blakenship* noted that the failure to seek mental health treatment should not be a determinative factor when assessing the credibility of a claimant suffering from a mental impairment. However, other courts have approved of an ALJ's reliance upon such evidence. *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990); *Atterberry v. Sec'y of Health & Human Srvs.*, 871 F.2d 567, 571-72 (6th Cir. 1989); *McCollough v. Sec'y of Health & Human Srvs.*, 1990 WL 47543, at * 4 (6th Cir. 1990). Consequently, the Court cannot say that the ALJ erred in relying upon Plaintiff's failure to seek mental health treatment. Moreover, the ALJ's finding that Plaintiff did not receive mental health treatment provided another reasonable basis for finding that Plaintiff did suffer from "severe" depression. There is no indication in the record that Dr. Redmon or any other physician had referred Plaintiff to a mental health professional or concluded that Plaintiff's episodic depression caused work-related limitations.

Plaintiff further asserts that her failure to seek treatment during the relevant time period was justified because she lost her insurance in 1993 when her workers' compensation case settled and thus could not pay for treatment. There is a gap in Plaintiff's medical treatment records with Dr. Redmon between November 1993 and 1996 although there is no objective proof that this was due solely to the loss of insurance. Furthermore, there is no evidence that Plaintiff tried to secure free medical treatment or that she could not afford at least an evaluation during the relevant time period given that she did receive a settlement. Furthermore, the record indicates that Plaintiff was receiving chiropractic care between 1993 and 1996 indicating that Plaintiff had sufficient funds to afford some medical care. (Tr. 167-74). More importantly, the state of Plaintiff's financial status does little to explain the lack of mental

health treatment prior to 1993. Given this evidence as a whole, the Court concludes that the ALJ properly determined that Plaintiff had not established the existence of a "severe" mental impairment during the relevant time period.

## 2. The ALJ's RFC Finding as to Plaintiff's Left, Upper Extremity

Plaintiff also alleges that the ALJ's RFC finding is flawed because he failed to include any limitations related to the radiculopathy which extended into her left, upper extremity and which the ALJ found to be a "severe" impairment. Plaintiff asserts that such an oversight is critical because Plaintiff is left handed.

Plaintiff argues that the ALJ's finding that she suffered from such a "severe" impairment was necessarily inconsistent with his RFC finding which included no limitations to account for this impairment. As noted previously, a determination as to whether an impairment is "severe" is a *de minimis* one and an impairment qualifies as "non-severe" only if it "would not affect the claimant's ability to work," regardless of the claimant's age, education, or prior work experience. *Salmi*, 774 F.2d at 691-92; *see also* 20 C.F.R. § 404.1521. Contrary to Plaintiff's argument, the ALJ *did* account for Plaintiff's radiculopathy in that he limited Plaintiff to sedentary work that requires lifting/carrying no more than 10 pounds occasionally. In other words, the ALJ concluded that Plaintiff's radiculopathy resulted in significant limitations in Plaintiff's ability to lift and carry which affected Plaintiff's ability to perform basic work activities. Thus, the ALJ properly concluded that Plaintiff's radiculopathy was "severe."[11]

---

[11] In any event, other courts have rejected this argument finding that a "severe" impairment found at step two of the sequential analysis need not necessarily affect a claimant's RFC. *See Griffeth v. Comm'r of Soc. Sec.*, 2007 WL 444808, at * 4 (6th Cir. 2007), citing to *Yang v. Comm'r of Soc. Sec.*, 2004 WL 1765480, at *5 (E.D. Mich. 2004); *Corley v. Comm'r of Soc. Sec.*, 1999 WL 970306, at * 2 (6th Cir. 1999).

The fundamental disagreement that Plaintiff has with the ALJ's RFC finding is that the ALJ did not include specific limitations related to Plaintiff's ability to use her left hand to perform manipulative functions requiring gross (handling) and fine (fingering) dexterity. Plaintiff contends that the ALJ was required to impose these restrictions because in July 1994 Dr. Oommen had found that the grip strength in Plaintiff's left hand was reduced by 50% and that she had difficulty picking up coins and opening jars with her left hand.

The ALJ did not ignore Dr. Oommen's findings[12] or Plaintiff's subjective complaints regarding left arm and hand weakness. Indeed, the ALJ discussed these matters at length in his written opinion. (Tr. 25-26, 27, 28-29). However, the ALJ noted that when this evidence was considered in combination with the other evidence of record, it supported a conclusion that Plaintiff could nevertheless perform sedentary work and that no other restrictions were warranted.[13]

Social Security regulations prescribe a two-step process for evaluating complaints of pain and other symptoms. The plaintiff must establish an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain rising from the condition, or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain. 20 C.F.R. § 404.1529(b) (1995); *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853

---

[12] Dr. Oommen's assessment of Plaintiff's grip strength was subjective in that it was dependent upon how much force Plaintiff was willing to exert when she squeezed his finger. Similarly, Plaintiff's demonstrated difficulty in picking up coins and opening jars could not be objectively verified.

[13] The state agency consultant's opinion that Plaintiff was limited to only occasional fingering and handling was based exclusively upon Dr. Oommen's findings noted above. Therefore, to the extent the ALJ found those findings inconsistent with the objective record as a whole, he implicitly rejected the consultant's opinions for the same reasons.

(6th Cir. 1986)).  If a plaintiff establishes such an impairment, the ALJ then evaluates the intensity and persistence of the plaintiff's symptoms. 20 C.F.R. § 404.1529(c) (1995); *Jones*, 945 F.2d at 1369-70.  In evaluating the intensity and persistence of subjective symptoms, the ALJ considers objective medical evidence and other information, such as what may precipitate or aggravate the plaintiff's symptoms, what medications, treatments, or other methods plaintiff uses to alleviate his symptoms, and how the symptoms may affect the plaintiff's pattern of daily living.  *Id.*

The ALJ referred to the objective, medical testing which showed that most recently Plaintiff had only mild ventral central extradural defects in her cervical spine but no nerve encroachment as of 1991.  X-rays and EMG tests of Plaintiff's left shoulder and upper extremities were normal.  There was no evidence of any diagnostic tests being performed on Plaintiff's left wrist or hand.

The ALJ also noted the lack of any clinical findings by Plaintiff's treating physicians that suggested limitations in Plaintiff's use of her left, upper extremities.  Between 1982 and 1989 it was noted that Plaintiff was neurologically intact and had no muscle atrophy.  She exhibited some limitations in her cervical range of motion and slight left hand weakness.  However, Plaintiff had a good range of shoulder motion, no parathesisas, and no compression.  Dr. Redmon noted in 1986 that Plaintiff did not demonstrate clinical signs consistent with carpal tunnel syndrome.  A work tolerance screening program evaluation further indicated that Plaintiff demonstrated functional grip (26 pounds on the left) and prehension strength, had the capacity to push/pull up to 27.5 pounds, and was able to work with small hand tools.  (Tr. 128-29).  Between 1990 and 1991 Dr. Redmond noted that Plaintiff had a supple left wrist and hand and a good range of cervical spine motion.  Her upper extremities were neurologically intact.  Furthermore, Dr. Oommen's other findings show that Plaintiff had no muscle atrophy or spasms in her upper extremities or hands.  She had a full range of motion in her left hand

and could oppose her thumb to each of her fingers. Sensation was decreased in only two of the digits on her left hand.

The ALJ also noted the treatment Plaintiff had undergone for her complaints. He acknowledged that Plaintiff had undergone physical therapy. However, Plaintiff had never undergone any surgical procedures for her cervical spine or left extremities and no doctor had recommended such a course of action. Although Plaintiff had been prescribed various medications, Plaintiff was often reluctant to take them. When Plaintiff did take medication, it was either over-the-counter or occasional doses of prescription medication. Dr. Redmond had informed Plaintiff that he could prescribe medication that would be effective and safe if she wanted to try it but there is no indication in the record that Plaintiff pursued this avenue of relief.

The ALJ also noted that, according to Dr. Redmon's records, Plaintiff's difficulties with her spine and upper extremities were only exacerbated when Plaintiff undertook rigorous physical activities. For example, Plaintiff reported problems when she helped her sister seal windows and when she was extremely active around the house. The ALJ reasonably concluded that such activities were more demanding than sedentary work with a sit/stand option.

Furthermore, the ALJ cited to the medical opinion evidence, which supported his conclusion that other limitations were not warranted. Dr. Jennings had stated that he did not believe there was anything "seriously wrong" with Plaintiff and Dr. Eckhouse noted that there was no "objective reason" for Plaintiff's complaints. Dr. Sperl had determined that Plaintiff was limited but only to the extent that she could not lift more than 25 pounds. As previously discussed, the results of a work tolerance screening evaluation showed that Plaintiff could perform sedentary work with a sit/stand option and that Plaintiff had functional grip strength and could use small hand tools. Furthermore, Dr. Redmon

indicated that Plaintiff had no problems with her hand and wrist and that she was able to function fairly well if her activities were limited. Based upon the evidence as a whole, substantial evidence supported the ALJ's RFC determination.

## VI.  **RECOMMENDATION**

The Commissioner's decision is supported by substantial evidence. Defendant's Motion for Summary Judgment (Docket # 8) should be **GRANTED**. Plaintiff's Motion for Summary Judgment (Docket # 7) should be **DENIED** and her Complaint **DISMISSED**.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: June 14, 2007                          s/ Mona K. Majzoub_____
                                                        MONA K. MAJZOUB
                                                        UNITED STATES MAGISTRATE JUDGE

**PROOF OF SERVICE**

       I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: June 14, 2007                    s/ Lisa C. Bartlett               
                                              Courtroom Deputy